Filed 6/25/15  P. v. Pura CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065704 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN312089-2) |
| RAYMUNDO FRONDOZO PURA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Meredith S. White and Allison Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose when the frail and incontinent 85-year-old victim, Frank Kiser, who was not ambulatory and was suffering from dementia, died in early June 2010 after

he became a resident in early October 2009 of a licensed board and care facility owned and operated by defendant Raymundo Frondozo Pura and was taken to a hospital emergency room in early May 2010. A jury convicted Pura of one count of felony elder abuse under conditions likely to produce great bodily harm or death (count 1: Pen. Code,[1] § 368, subd. (b)(l), hereafter § 368(b)(l)), and one count of involuntary manslaughter (count 2: § 192, subd. (b), hereafter § 192(b)). As to count 1, the jury found to be true two sentence enhancement allegations: (1) the victim suffered great bodily injury and was over the age of 70 years (§ 368, subd. (b)(2)(B)), and (2) Pura proximately caused the death of the victim (§ 368, subd. (b)(3)(B)). At sentencing, the court placed Pura on four years' formal probation.

Pura appeals, contending (1) his conviction of involuntary manslaughter must be reversed because the evidence was insufficient to prove he acted with criminal negligence, (2) his conviction of felony elder abuse must be reversed because the evidence was insufficient to prove he willfully harmed Kiser, and (3) his conviction of felony elder abuse must be reversed because the court erroneously failed to sua sponte instruct the jury on the lesser included offense of misdemeanor elder abuse. We affirm the judgment.

---

[1] All further undesignated statutory references are to the Penal Code.

2

FACTUAL BACKGROUND

A. *The People's Case*

Edna Musoke, a licensing program manager with the Community Care Licensing Branch (Community Care Licensing) of the California Department of Social Services, testified that Pura was the licensee of Bonair Rest Home (Bonair), a residential care facility for the elderly (RCFE, also known as a board and care facility) located in Vista, California. Unlike skilled nursing facilities, RCFE's are not required to have medical professionals on staff. In order to earn a license and manage an RCFE, an applicant must complete an orientation with the Department of Social Services, a 40-hour administrator's class, and a face-to-face interview. The licensee has the authority and responsibility for operating the licensed facility and is responsible for ensuring the health and safety of the residents and making sure their physical health is being taken care of appropriately. The rules and regulations that govern the operation of a licensed RCFE are found in title 22, division 6, chapter 8 of the California Code of Regulations and in the Health and Safety Code.

Musoke also testified that, under section 1569.72, subdivision (a)(1) of the Health and Safety Code, RCFE's cannot accept residents who require 24-hour nursing care or intermediate care. An RCFE also cannot admit a resident with a prohibited health condition, including stage 3 or 4 pressure sores. An RCFE can admit a resident with a "restricted health condition" (such as stage 1 or 2 pressure sores) so long as they have arranged for a skilled professional—such as a registered nurse, a licensed vocational nurse, or a doctor—to treat that condition. If a resident develops stage 3 or 4 dermal ulcer

3

sores while in the facility, the licensee is required to move the resident to a higher level of care, like a skilled nursing facility, because stage 3 or 4 dermal ulcer sores are a prohibited condition in RCFE's. Residents who depend on others to perform all activities of daily living for them are also prohibited from living in an RCFE. This includes residents who are bedridden. The regulations also provide that a licensee, whether an individual or "other entity," should exercise general supervision over the affairs of the licensed RCFE and establish policies concerning its operation in conformance with these regulations and the welfare of the individuals it serves.

Musoke also testified that Pura became the licensee of Bonair on November 5, 2002. Pura remained the licensee through the time the victim, Kiser, was taken to the emergency room on May 3, 2010. As part of the license approval process, Pura filed a facility program that included a policy indicating that the facility would observe all residents regularly to look for any changes in mental or physical condition, any such changes would be reported to family, and assistance would be given to the residents to meet their medical needs. The licensee and all caregivers working at the facility were responsible for regularly observing the residents. Administrators were required to report to the licensee because the licensee is ultimately responsible for the facility.

On September 24, 2009, Pura signed a form titled "Designation of Facility Responsibility" (the 2009/2010 designation of facility responsibility) that authorized

4

Pura's son, Alex Pura (Alex),[2] to accept documents on behalf of the facility in Pura's absence. Community Care Licensing did not receive this form until about a year later, on September 21, 2010.

In her testimony Musoke indicated that the signed 2009/2010 designation of facility responsibility did not transfer the facility's license to Alex and did not relieve Pura—the licensee—of responsibility. The license to operate an RCFE was nontransferable and, thus, a licensee cannot give the license to someone else. If someone other than the licensee wished to take responsibility for an RCFE, he or she would have to submit an application on his or her own behalf.

In his testimony Alex indicated that, although the Bonair RCFE license never transferred over to him, Pura began to shift responsibility for the operation of Bonair to him sometime in 2009. Alex testified that he considered himself "the administrator and caregiver" at Bonair. He took some classes to get his administrator's certificate but never completed the application process to become licensed.

Kiser was over 80 years of age when he was admitted to Bonair on October 2, 2009, a little over a week after Pura signed the 2009/2010 designation of facility responsibility on September 24. Pura was present when Kiser was admitted. During his time at Bonair Kiser was not ambulatory and, thus, he needed assistance to walk. He suffered from dementia, and he was incontinent and needed to wear diapers.

---

[2] As Pura and his son Alex Pura share the same last name, we refer to Alex by his first name.

Pura left for the Philippines on October 7, 2009, five days after Kiser arrived at Bonair on October 2. Pura returned from the Philippines about five months later on March 4, 2010.

Alex indicated that, after Pura returned from the Philippines in early March 2010, Pura would occasionally help him care for the Bonair residents. Alex testified that, on one occasion when Kiser was a resident at Bonair, Pura cared for the residents for the majority of the day while Alex took his family to Disneyland. Alex acknowledged "[t]here could have been opportunities" for Pura to have interacted with Kiser on that occasion.

Dr. Alan Krystal worked for Rancho Santa Fe Medical Group, which is also known as "Mobile Doctor." He testified that he treated Kiser from November 16, 2009 through March 1, 2010. The purpose of his first visit with Kiser at Bonair on November 16, 2009 was to address some abnormal lab results from a blood test. Kiser was a "frail, thin man." A test run that day showed Kiser was not dehydrated. Dr. Krystal also saw no indications of decubitus ulcers. Kiser was not terminally ill.

Dr. Krystal testified he saw Kiser again on November 23, 2009. Again, there was no indication Kiser was malnourished, dehydrated, had any decubitus ulcers, or was terminally ill. The same was true for visits with Kiser on December 17, 2009, January 4, 2010, and March 1, 2010. Dr. Krystal was supposed to see Kiser after the visit on March 1, 2010, but no follow-up visit was ever scheduled.

Dr. Krystal indicated that untreated ulcers or wounds in a frail man of Kiser's age can lead to very bad outcomes. Specifically, he testified that an untreated wound would

6

get infected and, if the infection got into the bloodstream, the person would probably go into septic shock and die.

Dr. Jairo Romero testified he was a geriatrician, a physician who specializes in the care of older patients. He explained that decubitus ulcers are categorized by four stages. A stage 1 ulcer is a superficial injury, with damage only to the top layer of skin. It can develop in hours to days. Between stage 1 and stage 2, one may see bruising, which indicates internal damage. A stage 2 ulcer, which is an open sore with breakage of the skin, can develop in days to weeks. A stage 3 ulcer has deeper damage to fatty tissue below the skin. It can take weeks to months to develop. A stage 4 ulcer has impacted the muscle and almost reached the bone. These also develop in weeks or months. Finally, the most severe ulcer is known as an "unstageable" ulcer, and this classification is used when there is necrotic tissue or scabs that make it difficult to determine the depth of the wound. Unstageable ulcers also develop in weeks to months.

Dr. Romero testified that stage 3 and 4 ulcers require 24-hour medical care. Based on his experience, an RCFE is not an appropriate facility for treatment of a stage 3 or 4 decubitus ulcer. He also testified that ulcers can be very painful.

Dr. Romero also testified that patients prone to aspiration or a swallowing disorder should be treated in a higher level care facility than an RCFE, such as a hospital or nursing home.

In late October 2009, Kiser was seen at the Veterans Affairs Medical Center hospital (VA hospital) in La Jolla. Dr. Romero testified that Kiser was suffering at that time from dementia. Kiser also had an "unstageable" decubitus ulcer on his right foot

7

and was referred to the VA hospital for treatment of that ulcer. He was treated at the VA hospital starting December 30, 2009, and was seen every two weeks until March 9, 2010. On March 9, 2010, Kiser was in a wheelchair, seemed stable, and was able to converse.

Dr. Romero testified that Kiser saw multiple therapists and doctors as early as November 2009, but his health deteriorated over the next few months as he became weaker and his dementia became more pronounced. Dr. Romero also testified that Kiser did not visit a medical professional during the 54 days prior to May 3, 2010 when 911 was called and he was taken to Tri-City Medical Center. At some point during that time period, Kiser became bedridden and contracted pneumonia.

An investigation conducted by California Department of Justice Special Agent Joanne Martinez following Kiser's death determined that Kiser was seen by a medical professional 16 times in November 2009, eight times in December of that year, four times in January 2010, three times in February 2010, and twice in March 2010. Kiser was not seen by a medical professional in April 2010.

Dr. Romero testified that on May 3, 2010, Kiser was not responsive and the paramedics were called. Dr. Romero testified that, when Kiser arrived at Tri-City Medical Center, he was having respiratory problems and was "coughing up." He had low blood pressure, a fast pulse, and was not very responsive. His initial examination revealed that he was in shock and had symptoms of severe dehydration and signs of pneumonia. Kiser had 17 decubitus ulcers. Several of the ulcers were stage 3, stage 4, or unstageable ulcers that had developed over a period of weeks to months. Based on the locations of the ulcers, Dr. Romero opined that Kiser had been lying on his back most of

8

the time in the weeks leading up to May 3, 2010, when he was taken to the emergency room, and might also have been sitting in a wheelchair for extended periods of time. Dr. Romero also opined that Kiser had been neglected in the weeks prior to May 3, 2010. When he arrived at the emergency room, Kiser was severely dehydrated and emaciated.

Dr. Romero also opined that Kiser's injuries on May 3, 2010, led to his death on June 1, 2010. Kiser's injuries were the natural and probable consequence of the lack of medical treatment. The cause of Kiser's death was aspiration, pneumonia with pulmonary failure, multiple infected decubitus ulcerations, and diabetes mellitus.

Agent Martinez interviewed Pura and Alex during the investigation she conducted following Kiser's death,. Just prior to the interview, Pura showed Agent Martinez the bedroom inside the main house at Bonair where he and his wife stayed after they returned from the Philippines. Pura told Agent Martinez he was aware of Kiser's ulcers when he returned from the Philippines. Pura said he knew there were issues but assumed his son was taking care of them. Agent Martinez also testified that when she interviewed Alex, he told her his father (Pura) was the main administrator and licensee of the business.

B. *The Defense*

Jonathan Wilson, a former resident of Bonair testified that Pura provided "very high quality" care to him while he lived at the facility. Wilson saw Pura care for Kiser in the common living room of the house. Kiser assumed Pura helped Kiser because Kiser would come out of his room for meals. Wilson testified that he and Kiser lived at Bonair from March to May 2010. Kiser was wheelchair-bound during that time.

9

Gloria Ash, a registered nurse and Kiser's stepdaughter, testified that she visited Kiser several times a month during his stay at Bonair. During her visits, Pura was sometimes at Bonair as well. Ash asked Pura about Kiser's condition during her visits. In April 2010 she did not see anything about Kiser's condition that caused her concern about his treatment or care. When defense counsel asked Ash whether she saw "any really horrible bedsores" on Kiser before he was moved out of Bonair, she replied, "No."

On cross-examination, Ash testified she knew Kiser had sores on his heels that were being treated by a wound care specialist at the VA hospital. She said, "I guess so," when asked whether, in her experience as a registered nurse, six weeks is too long for a frail person like Kiser who has unstageable ulcers to go without seeing a medical professional. Ash acknowledged that, given Kiser's condition, he required constant and consistent medical care. Ash testified that Kiser was communicative with her in his final months.

Pura testified in his own defense. He has some medical training from his time as a Navy corpsman, and he has a background in first aid. Pura purchased Bonair from a friend in 2001 and applied to have the license transferred into his name. He was the main caretaker and he managed all of the medical and administrative tasks at Bonair; his wife helped with the cleaning and bathing of the residents.

Pura taught Alex how to operate the facility by giving him "on-the-job" training. After Alex obtained his administrator's certificate in 2009, Pura let him take over the business when Pura and his wife left for the Philippines. Pura instructed Alex to transfer

10

the license of the business to himself and expected Alex to do it. Pura trusted Alex and did not follow up to determine whether Alex obtained the license transfer.

Pura testified he left for the Philippines in early October 2009. When he moved there he had no intention of moving back to the United States. Pura returned to the United States five months later in March 2010 to do his taxes and see his grandchildren. He testified that, when he returned, Bonair was no longer his and he did not resume his responsibilities there. He did not feel he was the licensee, an administrator, or a caretaker.

Pura also testified that, when he came back from the Philippines, he stayed in the guest house at Bonair. He admitted that he cared for the residents one or two times after he returned from the Philippines.

Pura testified that, before he left for the Philippines, he recognized that Kiser was not eating properly, and he told Alex to "address that as soon as possible." Pura testified he knew Kiser's medical condition could lead to dehydration.

Pura also testified that on May 3, 2010, Alex asked him to take a look at Kiser. Kiser did not look well, and Pura told Alex to call an ambulance. Alex called 911 and the paramedics transported Kiser to Tri-City Medical Center.

On cross-examination, Pura testified he knew how to treat bedsores. When he had treated patients with bedsores in the past, he had followed the instructions of medical professionals. He testified he knew untreated bedsores could lead to infection and death. He also testified he knew that frail, elderly, and bedridden persons were more vulnerable to bed sores. He also knew he was not permitted to care for residents who were

11

bedridden. Pura denied that Kiser was bedridden while he was at Bonair between early March and early May 2010. He testified Alex had completed a first aid course.

Pura testified he knew he was the licensee of Bonair and that, as the licensee, he was responsible for complying with the regulations of title 22. He acknowledged the regulations provide in part, "the licensee . . . shall exercise general supervision over the affairs of the licensed facility and establish policies concerning its operation in conformance with these regulations and the welfare of the individuals it serves." He also acknowledged the regulations define licensee as "the individual . . . having the authority and responsibility for the operation of a licensed facility."

Pura denied that he received phone calls from Alex during the time he (Pura) was in the Philippines. Pura acknowledged that, when he returned from the Philippines, he noticed Kiser's health had deteriorated. According to Pura, Alex was then in charge of bathing the residents, including Kiser. Pura acknowledged he cared for Kiser one day between March 4 and May 3 in 2010, from 10:00 a.m. to 6:00 p.m., while Alex was at Disneyland. Pura testified he did not know whether Alex had bathed Kiser that morning before Alex left for Disneyland.

DISCUSSION

## I. *SUFFICIENCY OF THE EVIDENCE* (*COUNT 2*)

Pura first contends his conviction of involuntary manslaughter must be reversed because the evidence was insufficient to prove he acted with criminal negligence. We reject this contention.

### A. *Applicable Legal Principles*

#### 1. *Involuntary manslaughter*

In *People v. Butler* (2010) 187 Cal.App.4th 998 (*Butler*), this court explained that, "[t]hrough statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony." (*Id*. at p. 1006.) "[C]*riminal negligence* is the governing mens rea standard for all three forms of committing [involuntary manslaughter]." (*Id*. at p. 1007.)

In *Butler* we further explained that "[c]riminal negligence has been defined in a variety of ways. In *People v. Penny*[ (1955)] 44 Cal.2d [861], 879, the court explained: "'[C]riminal negligence'" exists when the defendant engages in conduct that is "'aggravated, culpable, gross, or reckless"'; i.e., conduct that is "'such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard of human life or an indifference to consequences."' Similarly, in *People v. Rodriguez* (1960) 186 Cal.App.2d 433, 440, the court stated that criminal

13

negligence exists 'when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm.'" (*Butler*, *supra*, 187 Cal.App.4th at p. 1008.)

Thus, *Butler* explained, "involuntary manslaughter involve[s] a *disregard for life* . . . [that] is *judged by an objective standard*." (*Butler*, *supra*, 187 Cal.App.4th at p. 1008, italics added.) Involuntary manslaughter "requires a showing that a reasonable person would have been aware of the risk. [Citation.] Thus, even if the defendant had a subjective, good faith belief that his or her actions posed no risk, involuntary manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable." (*Id.* at pp. 1008-1009, fn. omitted.)

Thus, involuntary manslaughter requires a showing that the defendant's conduct—judged by an objective standard—was *criminally negligent*; that is, that the defendant acted (or failed to act) with an objectively unreasonable disregard for human life in that a reasonably prudent person in the defendant's situation would have foreseen that the defendant's conduct would cause a high degree of risk of another person's death. (*Butler*, *supra*, 187 Cal.App.4th at pp. 1007-1009.)

In addition to a showing of criminal negligence, "[i]nvoluntary manslaughter . . . also requires a showing that the defendant's conduct *proximately caused* the victim's death." (*Butler*, *supra*, 187 Cal.App.4th at p. 1009, italics added.) "[P]roximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so

14

insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death." (*Id*. at pp. 1009-1010.)

"When there are multiple concurrent causes of death, the jury need not decide whether the defendant's conduct was the primary cause of death, but need only decide whether the defendant's conduct was a *substantial factor in causing the death*." (*Butler*, *supra*, 187 Cal.App.4th at p. 1009, italics added.) The California Supreme Court has explained that "'"[t]here may be more than one proximate cause of the death. When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was *operative at the time of the death and acted with another cause to produce the death*.'"' (*People v. Sanchez* (2001) 26 Cal.4th 834, 847, italics added; accord, *Butler*, at p. 1009.)

2. *Standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

15

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury, supra*, 30 Cal.4th at p. 403.)

"If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [trier of fact's] verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

B. *Analysis*

In support of his claim that his count 2 conviction of involuntary manslaughter must be reversed because the evidence was insufficient to prove he acted with criminal negligence, Pura contends there was no evidence (1) that he knew of Kiser's condition before May 3, 2010, when Kiser was taken to the hospital; (2) that his leaving his son Alex in charge of Kiser's care at Bonair was negligent; and (3) that there was no causal relationship between his leaving Alex in charge of the facility and Kiser's death.

We reject these contentions. Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson, supra*, 26 Cal.3d at p. 578), we conclude Pura has not carried his burden of showing the evidence is insufficient to sustain the

jury's finding, in convicting him of involuntary manslaughter, that his conduct was criminally negligent. As already discussed, Pura's conviction of involuntary manslaughter required a showing that his conduct—judged by an objective standard—was criminally negligent; that is, that he acted or failed to act with an objectively unreasonable disregard for human life in that a reasonably prudent person in his situation would have foreseen that his conduct would cause a high degree of risk of another person's (here, Kiser's) death. (See *Butler*, *supra*, 187 Cal.App.4th at pp. 1007-1009.) Substantial evidence supports a finding that Pura's conduct was criminally negligent.

First, substantial evidence supports the jury's implied finding that Pura knew of Kiser's condition before Kiser was taken to the emergency room. The prosecution presented substantial evidence showing that Pura remained the Bonair licensee from the time of Kiser's admission to that facility in early October 2009 through May 3, 2010, the day Kiser was taken to the emergency room. Alex testified that Pura was present when Kiser was admitted to Bonair on October 2, 2009. Alex's testimony showed that Kiser was not ambulatory and, thus, he needed assistance to walk when he arrived at the board and care facility. It also showed that Kiser was incontinent and needed to wear diapers. Dr. Romero testified that when Kiser was admitted at Bonair, he was in a wheelchair, he was suffering from dementia, and he was showing some early signs of ulceration in one of his heels. As Pura was present when Kiser arrived, a jury could reasonably find that Pura was aware of Kiser's condition at that time.

Pura's own testimony shows that he was aware Kiser was not eating properly and that he told Alex to "address that as soon as possible" before Pura left for the Philippines

17

on October 7, 2009, less than a week after Kiser arrived at Bonair.  Pura acknowledged that a patient's not eating properly could lead to dehydration.  Pura further testified that he knew that frail, elderly, and bedridden persons were more vulnerable to bed sores and that he knew he was not permitted to care for residents who were bedridden.

Pura also testified he knew he was the licensee of Bonair and that, as the licensee, he was responsible for complying with the regulations of title 22.  He acknowledged the regulations provide in part, "the licensee . . . shall exercise general supervision over the affairs of the licensed facility."  He also acknowledged the regulations define licensee as "the individual . . . having the authority and responsibility for the operation of a licensed facility."  He acknowledged that, when he returned from the Philippines on March 4, 2010, he noticed Kiser's health had deteriorated and he appeared to be weaker.

The prosecution presented evidence that when Kiser arrived at Tri-City Medical Center, he was in shock and had symptoms of severe dehydration and signs of pneumonia.  Dr. Romero testified that Kiser had 17 decubitus ulcers and several of the ulcers were stage 3, stage 4, or unstageable ulcers that had developed over a period of weeks to months.

Alex indicated that, after Pura returned from the Philippines in early March 2010, Pura would occasionally help him care for the Bonair residents.  Alex testified that, on one occasion when Kiser was a resident at Bonair, Pura cared for the residents for the majority of the day while Alex took his family to Disneyland.  In his testimony, Pura admitted that he cared for the residents one or two times after he returned from the Philippines.

In light of the foregoing substantial evidence, which Pura largely disregards, we reject his contention that there is no evidence he knew of Kiser's condition before May 3, 2010, when Kiser was taken to the hospital.

We also reject Pura's contention that there is no evidence to support the jury's implied finding that he negligently left his son Alex in charge of Kiser's care at Bonair. The prosecution's evidence showed that the license to operate an RCFE like Bonair was *nontransferable* and, thus, a licensee like Pura could not give the license to someone else. As already noted, Pura's testimony shows he knew he was the Bonair licensee and that, as the licensee, he was responsible for complying with the regulations of title 22. Pura acknowledged the regulations provide in part, "the licensee . . . shall exercise general supervision over the affairs of the licensed facility." He also acknowledged the regulations define licensee as "the individual . . . having the authority and responsibility for the operation of a licensed facility." He further acknowledged that, when he returned from the Philippines on March 4, 2010, he noticed Kiser's health had deteriorated and he appeared to be weaker. Agent Martinez testified that Pura told her he was aware of Kiser's ulcers when he returned from the Philippines, and he also told her he knew there were issues but assumed his son (Alex) was taking care of them. From the foregoing substantial evidence, any rational jury could reasonably find under an objective standard that Pura was negligent in allowing Alex to be in charge of Kiser's care at Bonair.

Last, we reject Pura's contention the evidence was insufficient to prove he acted with criminal negligence because (he maintains) there was no substantial evidence of a causal relationship between his leaving Alex in charge of the facility and Kiser's death.

19

As discussed, *ante*, when there are multiple concurrent causes of the victim's death, a defendant's conduct contributes concurrently as a substantial factor and the proximate cause of the victim's death if it was operative at the time of death and acted with another cause to produce the death. (*Sanchez, supra,* 26 Cal.4th at p. 847; *Butler, supra,* 187 Cal.App.4th at p. 1009.). Here, as already discussed, substantial evidence established that Pura, as the Bonair license, was responsible under the applicable regulations for ensuring Kiser was properly cared for. Dr. Romero opined that Kiser had been neglected in the weeks prior to May 3, 2010, the day he was taken to the emergency room. Dr. Romero also opined that Kiser's injuries on that date led to his death on June 1, 2010. Dr. Romero further opined that Kiser's injuries were the natural and probable consequence of the lack of medical treatment. The cause of Kiser's death was aspiration, pneumonia with pulmonary failure, multiple infected decubitus ulcerations, and diabetes mellitus. We conclude the prosecution presented substantial evidence from which a rational jury could reasonably find that Pura's conduct, judged by an objective standard, was not only negligent, but also a substantial factor that proximately caused Kiser's death.

## II. *SUFFICIENCY OF THE EVIDENCE* (*COUNT 1*)

Pura next contends his conviction of felony elder abuse must be reversed because the evidence is insufficient to sustain that conviction. We reject this contention.

Section 368(b)(1), the statute under which the jury convicted Pura of count 1, provides:

> "Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death [and] having

the care or custody of any elder or dependent adult . . . *willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered*, is punishable by imprisonment in the state prison . . . ."  (Italics added.)

Asserting that "the only potential basis for liability [under section 368(b)(1)] was [his] permitting [Kiser] to be placed in a dangerous situation," Pura contends the evidence is insufficient to sustain his count 1 felony elder abuse conviction because "[he] did not willfully permit [Kiser] to be placed in a dangerous situation."

Viewing the evidence in the light most favorable to the judgment of conviction (*People v. Johnson, supra,* 26 Cal.3d at p. 578), we conclude the prosecution met its burden of presenting substantial evidence from which a reasonable trier of fact could find beyond a reasonable doubt that Pura willfully placed Kiser in a dangerous situation at Pura's board and care facility.  The court instructed the jury under CALCRIM No. 830 that to prove Pura was guilty of elder abuse in violation of section 368(b)(1), the People were required to prove (among other things) that Pura, "while having care or custody of [Kiser,] *willfully* caused or permitted him to be placed in a situation where his person or health was endangered."  (Italics added.)  The court also instructed the jury that "[s]omeone commits an act willfully when he or she does it willfully or on purpose."

We conclude that substantial evidence (discussed more fully, *ante,* in the factual background) amply establishes that Pura—knowing both that he was the Bonair licensee responsible for Kiser's care at that facility and that he could not transfer the license and the attendant duties and responsibilities to Alex—willfully caused or permitted Kiser to be placed in a situation where his health was endangered by (1) moving to the Philippines

21

and leaving Kiser for five months in the care of Alex, who was unlicensed and (as the expert testimony established) unqualified; and (2) knowing of Kiser's frail condition and deteriorating health after he (Pura) returned the Philippines, refusing to comply with his legal duty to supervise and ensure that Kiser received proper medical attention.

### III. *CLAIM OF INSTRUCTIONAL ERROR (COUNT 1)*

Last, Pura contends his count 1 conviction of felony elder abuse (§ 368(b)(1)) must be reversed because the court erroneously failed to sua sponte instruct the jury on the lesser included offense of misdemeanor elder abuse (§ 368, subd. (c), hereafter § 368(c)). We reject this contention.

A. *Applicable Legal Principles*

1. *Misdemeanor elder abuse as a lesser included offense of felony elder abuse*

In *People v. Racy* (2007) 148 Cal.App.4th 1327, 1334-1335 (*Racy*), the Court of Appeal explained that "the difference between felony elder abuse and misdemeanor elder abuse is whether the abuse is perpetrated 'under circumstances or conditions likely to produce great bodily harm or death.' If it is, the crime is a potential felony. (§ 368[(b)(1)].) If it is not, the crime is a misdemeanor. (§ 368[(c)].) Misdemeanor elder abuse is a lesser included offense of felony elder abuse."

Section 368(c) provides in part:

> "Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or *conditions other than those likely to produce great bodily harm or death* [and] having the care or custody of any elder or dependent adult . . . willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health may be endangered, is guilty of a misdemeanor." (Italics added.)

22

2. *Duty to instruct sua sponte on lesser included offenses*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 (*Blair*).) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Id.* at p. 745; see also *People v. DePriest* (2007) 42 Cal.4th 1, 50 (*DePriest*) ["Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense."].)

"To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Blair*, *supra*, 36 Cal.4th at p. 745; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.'" (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

3. *Standard of review*

We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

B. *Analysis*

The court in this matter would have had a duty to sua sponte instruct the jury on the lesser included offense of misdemeanor elder abuse only if there was substantial evidence from which a jury composed of reasonable persons could have found that Pura was guilty of misdemeanor elder abuse *and* not guilty of the greater offense of felony elder abuse. (See *Blair, supra*, 36 Cal.4th at p. 745; *DePriest, supra*, 42 Cal.4th at p. 50.) As already discussed, elder abuse is a misdemeanor if the defendant willfully caused or permitted the elder under the defendant's custody or care to be placed in a situation in which the elder's person or health was endangered under circumstances or conditions "other than those likely to produce great bodily harm or death." (§ 368(c).) Otherwise, if the defendant willfully caused or permitted such elder to be placed in a situation in which his or her person or health was endangered under circumstances or conditions "likely to produce great bodily harm or death," the elder abuse is a felony. (§ 368(c); *Racy, supra*, 148 Cal.App.4th at p. 1335.)

Here, we conclude the court did not err in failing to sua sponte instruct the jury on the lesser included offense of misdemeanor elder abuse, because there is no substantial evidence from which a jury composed of reasonable persons could conclude that Pura—who (as discussed, *ante*) was responsible for Kiser's care as the licensee of the Bonair board and care facility—committed the abuse under circumstances or conditions "other than those likely to produce great bodily harm or death" as required by the misdemeanor elder abuse statute (§ 368(c)). The cause of Kiser's death was aspiration, pneumonia with pulmonary failure, multiple infected decubitus ulcerations, and diabetes

mellitus. Dr. Krystal testified that untreated ulcers or wounds in a frail man of Kiser's age would get infected and, if the infection got into the bloodstream, the person would probably go into septic shock and die. Dr. Romero testified that Kiser did not visit a medical professional during the 54 days prior to May 3, 2010 and he was taken to Tri-City Medical Center. Dr. Romero also opined that Kiser's injuries on that date led to his death. Dr. Romero further opined that Kiser's injuries were the natural and probable consequence of the lack of medical treatment. We conclude the evidence establishes that Pura willfully caused or permitted Kiser, who was under Pura's care, to be placed in a situation in which Kiser's health was endangered under circumstances or conditions "likely to produce great bodily harm or death" within the meaning of the felony elder abuse statute (§ 368(b)(1)), and there is no substantial evidence from which a jury composed of reasonable persons could find that Pura committed the abuse under circumstances or conditions "other than those likely to produce great bodily harm or death" within the meaning of the misdemeanor elder abuse statute (§ 368(c)).

For all of the foregoing reasons, we affirm the judgment.

25

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

26